Good morning, Your Honors. Eric Slepian on behalf of Amelia Reichley, seeking a vacature of an ALJ decision denying Social Security disability benefits. I'm going to attempt to reserve two and a half minutes for rebuttal. Your Honor, that the decision of the administrative law judge contains error is not now in dispute. I point out that in the briefing, the commissioner has conceded a number of things. The commissioner concedes that the ALJ was wrong when he found Reichley not credible, when the ALJ interpreted a record that says Reichley's mother-in-law has pancreatic CA. The ALJ interpreted that as meaning the claimant traveled to California. When she did no travel, what it says is that her mother-in-law has pancreatic cancer. The commissioner in that concession is in the commissioner's brief at page 29 in footnote nine. The commissioner also agrees that the ALJ erred when he found Reichley was not credible based on her being uncooperative as Reichley attended consultative examinations and provided requested documentation. That concession is at page 18, and that's at footnote number six. The commissioner agrees the ALJ found Reichley's activities to replicate those necessary for work, but that Reichley's activities are not transferable to a work pace, and that's contained in the commissioner's brief at page 29 in footnote 10. What is disputed is other errors as well as the remedy to which Reichley is entitled to. While the commissioner asked you to affirm the ALJ decision, as noted in Brown v. Hunter, credibility findings are usually not. Harmless. And here we have three that are conceded. What's important to note is that the ALJ evaluated credibility based on incorrect standards. The ALJ wrote that objective data must establish the extent of limitations. That is incorrect. The objective data must establish the existence of the impairments. Once those impairments are established, symptoms must be credited if they're reasonably related to the medically determinable impairments, which in this case it's conceded they are, and there are no clear and convincing reasons for disbelieving Ms. Reichley. So help me with the pressure points, the number of pressure points. I took a look at the Revels case that you alerted us to, and so the 11 of 18 or whatever that standard is, is that just to figure out whether you in fact have fibromyalgia? And then you're saying that it's a whole other question as to how severe that impairment is? The short answer to that question is yes, Your Honor, but I'd like to elaborate on it. In the criteria for fibromyalgia, there are two distinct sets of criteria. One is the 1990 criteria, which does state that you need 11 of 18 positive tender points. Once those positive tender points are established, generally if there's a longitudinal documentation of chronic pain, all over body pain, fatigue, we rule in the fibromyalgia diagnosis. Once it's established, then we have to go on to evaluating the extent of those limitations, but it's not based upon whether there's decreased range of motion, loss of strength. Those aren't expected with fibromyalgia. Now there's also a 2010 ACR criteria. In that criteria, there's no requirement of any tender points at all. They go through a different set. They talk about the chronic pain, they talk about malaise, they talk about fibro fog, fatigue, and if the longitudinal record establishes that, then again, you have fibromyalgia. Those tender points aren't necessary in the 2010 criteria. That's established by Revels, and it's really well documented in SSR 12-2P. Right. But here, that, I guess it's the non-treating but examining physician found only seven, I think I call them pressure points, tender points, is that what you call it? Correct. And you're just saying that that's neither here nor there. Is that, that's the? It's neither here nor there because the administrative law judge agrees that Ms. Reikley suffers fibromyalgia and the commissioner concedes Ms. Reikley suffers from fibromyalgia. What's interesting though, and this is just an aside, the ALJ rejected the opinion of the treating providers who found 18 of 18 fibromyalgia tender points for one of the reasons that they didn't write how much pressure they put on that tender point. I don't, I never see a record that says that. I don't think it's required. It's not even the standard. But the ALJ turned it around and said, well, the consultative examiner found there were only seven. How much pressure did he put? It's unknown. It's not stated. And here there was, there was really a double standard. The administrative law judge rejected the opinion of Dr. Beach, who is at a minimum, a supervising physician. It seemed like he didn't have very much contact, personal contact with your client. Correct. So it's at a minimum, he's a supervising physician. And so the judge says, well, because you've only supervised the claimant, we're going to reject your opinion. And yet he gives greatest weight to a doctor that never saw her, never supervised her, nothing. The ALJ says he's going to reject the opinion of Dr. Beach because he's not a rheumatologist. And the ALJ gives greatest weight to the opinion of a pediatrician. So you can see throughout this decision, there's just this double standard that went through. They sent my client to Dr. Jones to do an evaluation. They gave him one record regarding MRSA to figure out what the limitations are in somebody who has positive Epstein-Barr virus, lupus and fibromyalgia. And then he took an x-ray of the right shoulder. Why? I don't know. Counsel, do we get to second guess the medical evidence and the weighing of that? Do we really get to pick it apart in that way? I'm sorry. I'm not sure I understand. Is that our role here to second guess the ALJ's weighting of the medical opinions? You're not here to second guess the weighing of the medical, of the ALJ's findings. You're here to determine whether the ALJ's findings are free of legal error. Supported by substantial evidence. Right. So when we have a case where there's differing medical opinions, then we look at what's the standard, okay? If everybody agrees the clinical signs are the same, and here I guess there's a question whether Dr. Jones agrees because he found seven tender points instead of 11 or 18, we have to look at 20 CFR section 404.1527C factors. And if you look at it, they talk about how much have they seen the claimant, what was their involvement in the treatment, what's their familiarity with the longitudinal record. All of that is what the ALJ is to consider in making his or her ruling. And then we look at that to see whether or not the substantial evidence in the record supports what the ALJ has done. If it can go either way, then there is substantial evidence in the record. So I don't find it particularly helpful to try to pit the doctor's relative credentials against each other and how they went about doing their job. If there's, you know, like I said, if there's evidence both ways, don't you lose? No. Well, one, there's not evidence both ways. The judge said I am rejecting a treating physician opinion because he's not a rheumatologist. And then the judge said I am accepting the opinion of a non-treating, non-examining physician who never saw the client without commenting on he's a pediatrician. And so it's not second-guessing. It's looking at these 20 CFR factors that are listed in the statute. And we have to apply the correct standard. If there's no dispute on clinical signs and medical findings, then to reject treating source opinion, they have to cite clear and convincing reasons. If there is a conflict, they still have to cite specific and legitimate reasons. If they're not legitimate and they're not specific, then you can't do it. And you can't affirm that decision. Let's look at the ALJ decision. Will you point me in the ALJ decision where you say that the treating physician opinion was rejected? Yes. He said he uses the term little weight. Well, that's not rejecting. That's the point. He didn't reject it. He did. Little weight and rejection are two different things. Your Honor, if I look and compare the judge's assessment of residual functional capacity and I compare it to the opinion of Dr. Beach, nothing's the same. Nothing. Dr. Beach found greater limitations in sitting, standing, walking, lifting, carrying. Dr. Beach found greater limitations in whether there's position changes that are needed, the ability to sustain an eight-hour work pace, whether pain would cause the claimant to be off task at all. Other doctors didn't even comment on that. But if you're just going to look at the administrative law judge's residual functional capacity, they're totally different. There's nothing that's the same when you compare those two opinions. And I don't want to miss out on talking about the opinion of the physician assistant. We have almost 100 treatment records, when your total physician assistant records, infectious disease doctor records, pain management records, and they're rejecting her opinion because she's a physician assistant. Counsel, going back to Dr. Beach, did Dr. Beach actually treat Ms. Reichle? It's hard to tell from this record. Right. We ordered labs, for sure. We see his name on that. We know that he supervised the care. That's not disputed. Whether he actually came in and did a physical examination, based on the records we have, I can't answer that question. I just don't know. All right. Well, Counsel, you can say... Oh, go ahead. Go ahead. No, I was going to say you exceeded your time, but Judge Wallace has a question. I have a question that you just brought up tangentially about the physician assistant. I understand now that you walk in, you don't get to see the head man, but these people who are less than medical doctors are certainly not the same as a medical doctor. They're qualified to do what they do, and they can do that. But it's not on the same par. It's apples and oranges of comparison. And I don't know quite what to do with an assistant. Your client is a medical biller, and I don't even know what a medical biller is. I guess they make out bills. But all of these tasks that doctors used to do, they have now other people with less qualifications. So how do we treat the physical assistant in weighing it against the opinion of a medical doctor? That's a great question, Your Honor. And that is answered in the case of POPA, or POPA, I think it is, which is cited in my reply brief. It was actually decided after the opening brief was filed, and I believe after the responsive brief was filed. But they talk about the status of health care now, how Social Security recognizes that a lot of treatment is provided by physician assistants, and that those opinions are entitled to weight. It also notes that there's been a change in the regulations where they are now treated as acceptable medical sources, pretty much on par with treating doctors. On a par with a medical doctor? We have to treat them the same? Under the new regulations, which only apply to claims filed after a certain date, my client's claim was filed before that date. But it just goes to show you that they had a policy ruling that says, look, we recognize a lot of treatment is going to be provided by PAs. We're going to give those opinions weight. We can't penalize the claimant because the health care system doesn't allow for it. But it seems to me rather strange to say that it's the same as. They're given the same weight as a medical physician. Well, they're certainly given greater weight than non-treating physicians as well as consulting physicians. Greater weight than non-treating physicians? Under the new regulation, because you have to look at 20 CFR section 404.1527C factors. Does the regulation say, though, specifically, that a treating physician's assistant's opinion is given greater weight than a non-treating medical doctor? I don't believe it gives us that specific language. I would be surprised. But at any rate, it doesn't apply to our case because it's out of time? Well, but if you look at the Popoe case, which I think also involved a case that was filed prior to the change in the regulation, they talk about not crediting or considering physician assistant opinions similar to that of treating providers is antiquated under our system of health care. All right, counsel. You greatly exceeded your time. We've helped you with that, so I'll give you a minute or two for rebuttal. Thank you. Let's hear from the government. Good morning. May it please the court. Jeff Staples on behalf of the commissioner. I think Judge Rawlinson is asking the right question here, and that's, when the facts can go either way, what do you do? I'm not going to get up here and tell you that the ALJ's interpretation is the only reasonable interpretation of the record. A different fact finder could reasonably have come to a different conclusion. But under substantial evidence review, what this court does in that kind of case is defer to the ALJ's reasonable assessment of the evidence. This is a case about mostly fibromyalgia, and generally impairments that are largely not quantifiable based on objective medical evidence. And I thank my colleague for pointing the court to the Revels case because I feel that it's instructive here. In the Revels case, the court said that people that are treating a person with fibromyalgia don't ordinarily see any objective signs of that impairment. It's based almost entirely on the claimant's subjective reports. But the difference between this case and Revels is that in Revels, this court found that the claimant was credible. And so the medical opinions that were based on those credible statements were themselves credible. Here, by contrast, the ALJ gave several good reasons. But each of the reasons the ALJ gave, it seems to me, were themselves flawed. So maybe you can tick through those. The one you just pointed to, that you started with from Revels, is the number one reason the ALJ gave, which is there's no objective medical evidence to support her claim that she's suffering in this way. And we know that for fibromyalgia, we can't expect there to be the kind of hard medical evidence. And the Revels case says that. So that's one reason just wrong right there. And if you go through each of the other ones, which I'm hoping you'll do, to tell me I'm missing something, it seems like the ALJ just missed the boat on each of them. I think the ALJ, as my colleague pointed out, the ALJ generally said that a lack of objective evidence does not work in the claimant's favor. But then the ALJ went through and specifically said, it's not just a lack of objective findings, there's also a lack of treatment for the impairments that she claims are disabling. How so? She goes to the doctor, I can't remember how many times we have records for, but there's a long course of treatment. What the ALJ faulted her for was not seeking more aggressive treatment. And she explained why she had not, I think, what was it, to go see that specialist. There was an explanation for why she wasn't able to obtain that care. Well, in Revels, this court explained the importance of a rheumatologist in treating fibromyalgia, and that's because really only a rheumatologist is able to understand the impairment. And so it was reasonable for the ALJ to, she did offer an explanation of why she didn't follow up with a rheumatologist, which was that a rheumatologist finds fibromyalgia with her other impairments to be too complicated. And elsewhere in the record, she said that the rheumatologist said she was untreatable. The ALJ can look at that and say, well, fibromyalgia is not untreatable, and she's receiving treatment from the physician's assistant. It was the combination of her ailments that caused the person to tell her that we're not going to be able to help. And she's, I mean, I think she was saying that she still wanted to go see a specialist. It wasn't like she was rejecting that as a course of treatment. I can't remember if there was some issue with her insurance or what it was. But I think even as of the time of the hearing, wasn't she saying that she was still trying to get into? She said that the doctor never called her back. And so I think the ALJ is entitled to look at a person who is complaining of disabling fibromyalgia and other impairments and say, that doesn't really ring true to me, that you wouldn't go to the one specialist, you wouldn't follow up with the specialist who is in the best position to treat your impairments after the people who are currently giving you treatment have told you to go to that doctor. That combined with the lupus, which she said at the hearing was her most disabling impairment, but the record shows that that wasn't really being treated at all at ER 566 and 419. It shows that she just wasn't, that the doctors weren't really doing anything about that. How about her daily activities? The ALJ again faulted her for basically doing too much for him to believe that she was suffering in the way that she said? Well, she said that she was lying down every day and for many days, it was many hours during the day. Nevertheless, she was able to work after her alleged onset for weeks or months at a time. Yeah, but she wasn't able to continue because, precisely because of her condition. Yes, Your Honor, but she said she was laying down for hours every day, but then for periods of weeks or periods of months, she was able to work. So if you say you have to lie down for hours every single day, but then you can work for months at a time, there's something that is not coming together on those two facts. So the ALJ was able to look at those things and say, this just isn't lining up for me. And as I said before, and as Judge Rawlinson was asking about earlier, maybe a different fact finder could have reconciled those two things. But on this record, I can't say that it's unreasonable. I think the fact that she tried to work and wasn't able to supports her case, it doesn't undermine it. It shows that this is not somebody who wants to be lazy and lay around and collect a check. She wants to work. She was in an economically desperate situation. That's what compelled her, despite her basic inability to do that, to go out and try to find some work that she could do. And she failed at that because of her condition. It's not because of a lack of desire. And I don't know how you or the ALJ would look at that and say somehow that we're going to turn that against a claimant. That just seems to me completely backwards. Well, it's just taking what she's alleging, which is, I can't go a single day without laying down. For many days, it's hours at a time. And then for a period of several weeks or several months, then I do go out and I work at a regular scheduled job. And the ALJ did not hold the fact that she was trying to work. You know, the ALJ didn't find that that was disqualifying substantial gainful activity or anything like that. But I just can't say that it's unreasonable to look at those and find a conflict there when she says she just really can't do anything, can't go out because her pain is so disabling. How about the ALJ's demeanor finding? Isn't this just the classic sit and squirm type jurisprudence that we've condemned over and over again? I don't see any difference in the ALJ's finding here. That is one permissible reason when it's accompanied by others. And the ALJ said that this is not the whole basis. I didn't just come in, look at her, and say, oh, you're out of here. You know, that's one factor among many that the ALJ is permitted. Although this Court has expressed general disfavor with the practice, this Court has never said that that's an absolutely impermissible reason. And so, you know, I think that's part of why this is a substantial evidence review because the person who's sitting there across from the claimant needs to be afforded some deference in saying I looked this person in the eye and us here on a cold record with, you know, a hearing transcript can't really get that same sense. So that's, I think, why an ALJ is generally permitted to do that. Shouldn't we be suspicious of basically all of the ALJ's reasons here, given that your opponent started out with three concessions of error that you gave. I thought there were more than that. I was kind of shocked at how many times you, I don't know if it was you personally, but the Commissioner, was not even able to defend the reasons that the ALJ gave. And that, I don't know, I thought we had maybe in other areas. We had jurisprudence that suggested that when there are that many completely just flat-out incorrect reasons given, that it kind of calls into question the legitimacy of the other reasons that are given also. Respectfully, I would point the Court to the Carmichael case, which says that that is not how harmful error works. Harmful error works such that if there are really no more reasons supported by substantial evidence remaining, then the presence of erroneous reasons becomes harmful. But here, these were a few isolated findings that the ALJ made that the Commissioner concedes were erroneous, but they did not taint the entire credibility finding because the ALJ went on to describe, as I've discussed, the limited treatment, the normal objective findings, her denial of pain in many points, and her work activity, all of which were inconsistent with her allegations. So those few limited errors do not undermine the substantial evidence of the rest of the ALJ's reasons, and so don't negate the credibility finding and don't rise to the level of harmful error in this case. I'd like to make one other point about POPA. That was a nurse practitioner, and in any event, the standard is still lower, as POPA concluded. When you're talking about, as Judge Wallace was pointing out, when you're talking about a non-acceptable medical source, this Court requires much less stringent reasons from the ALJ when the ALJ is going to discount an opinion from a non-acceptable medical source. So if there are no further questions, we ask the Court to affirm the district court's judgment. Thank you, counsel. Rebuttal? Let's put two minutes. Two minutes. Thank you, Your Honors. Your Honors, I was not able to pull up revels while opposing counsel was talking, but I was the attorney on that case. I do believe in revels the administrative law judge found the claimant not credible, and that was one of the errors noted by the Court, and they discussed the standard that must be applied. So when counsel says that revels was found credible by the administrative law judge, I don't believe that that's accurate. They were also focusing in on my client's statement that she believed she was told that fibromyalgia was untreatable. Well, she reported to her doctor after she saw the rheumatologist, and that contemporaneous record from her doctor says the rheumatologist told her her case was too complicated and he wasn't comfortable treating it. She did everything she was supposed to do. Now, what's interesting is fibromyalgia is not curable, and she says it's not treatable. I mean, you're talking about a patient who's dealt with pain for years and years, who's seen the doctor over 100 times, who hasn't had any relief. I mean, we can't just be that particular on every single word an individual uses. What she says is rational, what she says is reasonable, and there's no intent to mislead. Counsel, was there a medical record from the doctor noting that her fibromyalgia was not treatable, the rheumatologist? Was there anything in the record from the doctor saying that her condition was not treatable? There's a record from the primary care physician that says she saw a rheumatologist. But that was based on her reporting of what happened. I'm asking, is there any medical evidence in the record? Any report from the doctor himself or herself that said this condition is not treatable? I don't believe that there is. I'm not 100% sure, but I don't believe that there is. But again, we have a contemporaneous record that was reported to a treating provider. I mean, you can't just assume all patients are lying to their doctors all the time. But our records do say that, you know, if the doctor relies on self-reporting that's not consistent with the other medical evidence, it can be discounted. We don't have to accept the word of the claimant either. We don't. So... But, Your Honor, there's nothing inconsistent between her reporting, the diagnosis, and the treatment. The only thing that's different is they had their doctor look and say she can work, and they sent it to a doctor who looked at her without reviewing any records. Those are the only two inconsistencies in this record. I find it hard to believe that a rheumatologist would say that fibromyalgia is not treatable. It's... Again, Your Honor, fibromyalgia is not curable. I don't believe the doctor said it's not treatable. I believe the doctor said that we can treat you with medications, but we cannot cure your disease. You're going to have pain. But I thought she said that the doctor said it was not treatable. Your Honor, if I go to a doctor and the doctor... Is that what she said? Yes or no. I believe she used the word treatable in her testimony, but she did not use the word treatable when she reported it to a primary care physician. The report to the primary care physician was contemporaneous, and we're talking about what she said at a hearing when the judge says, what did the rheumatologist tell you? And she says that it wasn't treatable when the record shows that it wasn't curable and the doctor wasn't comfortable treating her because she had lupus, she had positive Epstein-Barr virus, she had MRSA infections, she had recurrent infections with antibiotics. She's being prescribed all the appropriate treatment for the impairment. If she had gone to the rheumatologist, the treatment would have been the same. What is the point? Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision. The next case on calendar, Mateo Sandoval and Avedano Ruiz has been deferred. The next case on calendar for argument is Gerdakis v. Brentwood Union School District.
judges: Wallace, Rawlinson, Watford